We have four cases in the calendar this morning. One principal common issue, same parties, two of them appealing from holdings of eligibility and two appealing from holdings of ineligibility. There are some other issues. You have a lot of issues, but I would ask after the first two cases you switch just so we can keep straight, so I can keep straight who's who. To the extent that there are common issues, we would ask that you not be repetitive. No one's going to be mocked down if you don't cross every T on each issue in each case when you've already dealt with it. So first case is Trade Station Group, IBG v. Trading Technologies, 2017-17-32. Mr. Kikar. Good morning and may it please the court, to be addressed the 101 issues in this case first. I just want to point out from our perspective the 101 issues involving the 304 patent in this case and the 132 patent in the case that follows. I think rise and fall together, there's very few differences in the records. The 304 and 132 patents claim a fundamental economic practice that is embodied in a pre-electronic analog. That was the specialist book, Specialist Using Pen and Paper, would display in that book the very same information that is claimed in the 304 patent. Your biggest problem, it seems, is that the Patent Office concluded that your arguments did not differ from those that were proffered in the CQG case and that both the 304 and the 132 had been expressly dealt with in the Federal Circuit on this exact issue and to the extent that you haven't raised any factual issues that that was a decision on a legal point, not a factual one that was record-based then or necessarily now, at least according to what the office wrote here in this opinion, in particular on Appendix Page 4. So can you address why it was an error for the court to, or for the board, to take into account and say that we don't see a persuasive reason to deviate from that logic? I mean, they clearly didn't understand them to be bound by it, but they nonetheless found it persuasive. So can you focus on that? Yes, we've briefed, I think there's an APA problem. At the threshold, the board didn't explain why it found the evidence in particular that we presented to be persuasive or not persuasive. It sort of brushed those... Well, it didn't say persuasive reason on legal. Basically, they treated it as a question of law and they didn't see any basis to deviate from the prior determination of law on the same record. I think it's helpful to go back to how this case proceeded below the PTAB. So the parties had briefed all the issues, they had actually had an oral argument from the board, and then the CQG decision came down, they asked for additional briefing on why CQG wouldn't control before they issued their final written decisions. And in that briefing, IBG presented to the board both legal arguments about the abstract idea and Alice Step 2, as well as evidence, which we've presented in our brief. The Weiss reference, you see it with the Intex GUI, and then finally with the TSE interface. And it is our position that the board needed to contend with that resolve the first question under the Alice prong one, whether or not there's an abstract idea. If you look at the CQG decision on its own terms, it says that it adopted the district court's rationale, and then it expressly says that, among other things, it finds it wasn't an abstract idea because the claims of the 304 patent are not directed to a long-known idea. To the extent that you're... I'm trying to understand your argument, and I'll be honest, I'm not completely following it, because are you focusing on Step 1 or Step 2 of Alice? Step 1. Because I don't understand that we've ever suggested that there are factual underpinnings of Step 1, and if Step 1, namely, is this claim directed to, which sounds like claim construction, right? Directed to an abstract idea. That's a legal question, or at least I haven't seen you... you didn't argue in your brief that it was a factual question. No, we did. If you look at our standard of review and the legal... Well, your standard of review was that, overall, the 101 question can contain questions of fact, but I didn't... I guess I didn't appreciate that you were arguing that Step 1 is itself factual, or contains questions of fact, or what... Yes. Help me understand. That Step 1 can, in many cases, involve subsidiary factual issues. Such as? So, for example, if you look at the Alice decision at the Supreme Court, they looked outside the intrinsic record of the patent and considered treatises and the financial services industry. This court has said in Berkheimer, of course, that you can have factual inquiries under the second step of Alice. We believe that there are good reasons to... Under the second step of Alice, there's factual inquiries, but I guess I still don't understand your argument about Step 1. Sure. I think that this case illustrates well why there ought to be factual inquiries under Step 1. The way the CQG... I don't think this case indicates there ought to be factual inquiries under Step 1. At least, I don't understand the argument to be persuasive. I think the problem you have is you just think that the CQG decision got it wrong, and you think the board should not have followed it, even though they weren't found by it, and you're a different defendant. I mean, that seems to me what you're really arguing. Respectfully CQG had a set of facts in front of it, and if you read the decision, it only considered the patent itself. And the problem with that is that when we look at whether something was long known or a long-standing economic practice, the patent may not answer that question. And if we don't look outside the patent, that invites mischief from patent trackers. Now you're talking Step 2 again, aren't you? No. In Step 1, whether something is a fundamental economic practice can require... Long known. You said long known. That's Step 2. That has nothing to do with Step 1. Step 1 is focusing on whether it's directed to an abstract idea. Whether the abstract idea is new will not save you from ineligibility. Many formulas are new. They're still abstract because they're formulas. True, but if we look to the Alice and Bilski decisions, the Supreme Court looked outside the patent, cited treatises in its decision for the notion that what the claims in those cases were directed to were fundamental economic practices. And this case, I think, illustrates the instance where if you look just at the patent, you wouldn't understand what the fundamental economic practices were, which we see from the specialist book and the trading interfaces that followed it. And if we don't look outside the patent, as I was about to say, it invites mischief from patent drafters. They will say self-serving things that will obscure or omit what were the fundamental economic practices at the time of the invention. It's very important to look at the case. What it shows is that the claims here are directed, again, to a fundamental economic practice. And the 304 claims essentially say, computerize them. The claims there are directed to a series of results, a number of displaying steps. The displaying steps involve nothing more than presenting information. Mr. Pickard, you're moving into what you were saving for rebuttal. You can continue or save it. And then, of course, you're splitting your time with the government. You'll be back. Ms. Allen, are you speaking first? Next. I have been misinformed. Mr. Gannon. You are Mr. Gannon. I am Mr. Gannon. You are a Pelley counter. Were they a cross appellant? Cross appellant. So you're only going to the government would go next, and then I would respond to both. Well, that's what we were given by the clerk's office when you all checked in, that the government would proceed. Well, Mr. Gannon will be replying to the government's position, correct? Correct. So I think we ought to hear from the government next. And you have five minutes. Sorry for the confusion. Did the Supreme Court analysis rely on extrinsic evidence in arriving through and working through step one? I'm sorry, Your Honor. The United States has intervened in this case only to address trading technologies, retroactivity, constitutional challenges to cover business method review. All right. And with respect to that issue, as we've explained in our briefs, we think that trading technologies challenges are forfeited and that these CBM reviews do not involve a retroactive application of the law at all. But I would like to focus on the actual due process and Congress had a rational basis for applying a covered business method review to all patents that were in existence when the AIA was passed. And that was to correct agency errors and to ensure that patents are kept within their legitimate scope. And those were the reasons this court relied on in Patlex, and they apply fully here. And then with respect to the takings argument, we think that the cancellation of a patent through covered business method review does not constitute a taking because it rests on a determination that the patent holder never had a valid property interest in the first instance. So when the Supreme Court said in oil states that a decision should not be misconstrued, our decision should not be misconstrued as suggesting that patents are not property for in support of its argument about CBM. Are you arguing that the Supreme Court was wrong there or that in this particular case, this issue, a due process clause or takings clause has been not raised? We're not saying that the Supreme Court was wrong. We agree that valid patents are property interests. Our point on the takings issue is merely that when the board cancels a patent, which happens after this court has affirmed the board's finding of unpatentability, that that is a determination that there never was a valid patent. The patent holder never had a valid property right. And therefore, there was no taking. And so we think that that resolves the taking issue. And in addition, it could also be viewed through the lens of compensation. And at the point where both this court and the PTO have determined that patent claims are unpatentable, the patent holder would be due no compensation because the value of the patent would be nothing. And then just to focus on the due process inquiry, again, the Supreme Court did not resolve that issue, but this court did resolve a very similar issue in Patlex. In that case, this court held that the ex parte re-examination procedures did not violate the due process clause even when they're applied to patents that were issued before the creation of ex parte re-examination. And we think that that reasoning applies equally here to covered business method review. The government argues, as I understand it, that the patentee forfeited their constitutional arguments because they didn't raise them before the board. But is it correct that the board can't address constitutional issues? No, Your Honor, the board does address constitutional issues. In MCM portfolio, for example, the board did address Article III and Seventh Amendment challenges to inter-parties review. The board has addressed sovereign immunity issues in a number of cases. So we do think the board could have addressed the issue if they had raised it before the board. And that is the general rule, is that a party must raise something before an agency in order- and if the board couldn't address these issues, then it would be futile to raise them before the board. At least that's their argument. That is their argument, Your Honor, and we don't think it would have been futile. First of all, as past practice has shown, the board could have addressed it and provided reasoning that this court could have then reviewed. In addition, the board could have decided not to institute covered business method review or could have terminated a covered business method review if it agreed with the patent holder's arguments that such review would be unconstitutional. Did the board decide in Sony that or it acknowledged that it lacks authority to rule on constitutional issues? I'm not aware of that particular case, Your Honor. I do know that in MCM portfolio, the court did address the Article III and Seventh Amendment issues that were then later resolved by this court. So we think that the board could have addressed these issues had they been raised. Again, we recognize that forfeiture is obviously discretionary. Our point is just that the general rule is that parties must raise issues before the agency if they want to preserve them for appeal. They didn't do that here. There is no exceptional reason to deviate from the general rule. I understand that you're telling me that in a particular case, the board did look at constitutional issues, but I'm a little perplexed, as I sit here, because it's been my understanding that the PTO, as part of the executive branch, isn't permitted to rule on constitutional challenges. Am I just completely mistaken in my understanding of the law, the separation of powers and law issues? I mean, are you telling me that the PTO is allowed to make rulings on constitutional issues? Well, Your Honor, for example, the statute that provides that the director may institute covered business method review does not require the director to So if the board did agree with a patent holder's argument that such review would be unconstitutional, the board could have declined to institute the review. I'm sorry, maybe you misunderstood my question. My question was, it's been my understanding that the board, the PTO, is not permitted to rule on constitutional issues. I understand that you've given us a particular case where they appear to have done so, but it's my understanding that that's not the correct state of the law. The fact that they did it in a given case, and maybe that wasn't challenged or ruled upon, the propriety of the PTO rendering an actual binding determination on a constitutional issue, I thought that that wasn't appropriate under the law. Am I wrong about that? I mean, I'm not positive, and I don't have the cases in front of me. Am I wrong in my understanding that separation of powers would prohibit the executive branch from ruling on the constitutionality of statutes? Well, your honor, I know that the board has addressed constitutional issues. I don't care if they've addressed them. I don't care if the board's done it in the past. Here we've got an argument that they're not permitted to do it, and I want to know from you, are they permitted? Under separation of powers, is the executive branch allowed to rule on the constitutionality of a statute? I don't see why they couldn't issue an opinion regarding their view of the constitutionality of the statute. That doesn't make sense to me. What is that, an advisory opinion? That's not what I'm asking. I'm asking if they can render rulings on constitutional issues. I don't know. It's been my understanding that they could not, that the board was not permitted to make determinations of constitutionality. I understand that you say there's a couple cases in which they've done so, but maybe my recollection is completely wrong. And I probably wasn't clear in one of my earlier answers, but a way in which the board could do that would be to decline to institute. That's not a ruling on constitutionality. That's a discretionary decision by the director, which could be based on his view of what our determination of constitutionality would ultimately be. An article three tribunal, which is definitely, has the right and duty to rule on constitutional challenges. Your honor, I'm not aware of any reason that the board could issue. My understanding is the same as Judge Warren. I have the same concern. It seems to me that if an agency makes constitutional decisions, and it's by definition acting outside of the statute under which it was created, it's by definition acting outside of its regulations because it's relying, it's interpreting something that it doesn't have the authority to do. I mean, it's got the authority to establish regulations to interpret that or to interpret the statute. I don't see that it has authority to interpret the constitution. Could the PTO rule itself unconstitutional? Well, your honor, again, I think something that the board does have authority to do is, or the director, which has been delegated to the board, is to determine whether to institute a covered business method review. And again, I don't want to, sorry, one other point would be that in this court's decision in Ray DBC, this court held that a party had forfeited an appointments clause challenge to the administrative, I believe the administrative patent judges. So in this case, has there been a waiver of the takings and due process arguments? Yes, your honor. We think that there has been a forfeiture of all of the constitutional arguments because trading technologies did not present them to the board. Counsel, I think you've well exceeded your time and if you have any further thoughts on this same issue, I think you'll be back. Thank you. Mr. Gannon for cross-appellant. And you want to save some time for your reply, rebuttal on cross-appeal. So it's up to you. Thank you, your honor. Good morning, may it please the court. I know there are a lot of issues here today, but I think we should start with a threshold question of jurisdiction. Because if there's no jurisdiction here, then none of the other issues need to even be reached today. Because 13 of TT's patents have been swept into the CBM proceedings, TT previously filed a writ of mandamus to this court asking it to correct this reoccurring jurisdictional error. And that motion was denied, but you said we could come back after the final written decision, now is the time. Congress specifically carved out technological inventions from CBM review. And while this court has yet to find that a patent meets the technological exception, this is that case. The CBM issue is straightforward. First, the 304 claims recite an improved graphical user interface or GUI. Improved GUIs improve computer functionality because graphical user interfaces are part of a computer. Claims that improve computer functionality are technological inventions. CQG case makes this simple. In the CQG case, this court looked at the 304 and 132 patent and made findings that the claims are technological. This court said that the claim subject matter is directed to a specific improvement to the way computers operate. The graphical user interface imparts a specific functionality to a trading system directed to a specific implementation of a solution to a problem in the software arts. The board ignored those findings. Okay, well the board doesn't have to follow those findings. They're not finding on the board. Correct. So I don't see how a GUI affects a computer function. I see how it impacts the user's engagement with the computer functions, but I don't see how it impacts computers functioning. It impacts the computer functioning, Your Honor, because in prior art, there were problems with these graphical user interfaces, these screens. They had problems with speed, accuracy, and usability. The claims of these patents solve problems with those particular graphical user interfaces. It does affect how the trading interface operates. It's the front end. You're right. No, it affects how the user can input information about trades and ensures the accuracy when they do so. That's all about problems with user interfaces, and the accuracy you're talking about is not within the computer. It's between the user and the computer. It doesn't improve computer functions. You know what it does? It improves users. That's actually inconsistent, Your Honor. I respectfully disagree. The specification is very clear. The problem isn't with the trader or how long it takes the trader to make an order. The problem is with, for example, the figure two style screen, the grid, the market grid, where prices are flipping in the grid, and the trader goes to make an order, and the price flips out, and the trader gets an unintended price because of that. Because they click on the wrong thing. They click on it after it changed. No. This is user error. It's the user clicking the button to activate or select at a time when what's being offered has changed. It's not a problem. That's not the problem, Your Honor. The problem is at the time the user goes to click, because of the way the figure two style screen is constructed, because the prices are flipping in the grid, as this court found in eSpeed as well, that causes the problem. Because when the trader wants to exit... It has nothing to do with the computer. It has to do with the user. This is just user error. You can spend your time however you want, but I don't really have a lot on this that I want to hear about. Your Honor, respectfully, in the eSpeed case, this court has already found that there were problems with the prior art screens, with prices flipping in the grid, and the problem with that screen, it created a problem with respect to the trader being able to get an unintended price. The patent, this patent... This is user reaction time. That's your problem. It has nothing to do with the computer. It's user reaction time. But Your Honor, with respect to figure two in the prior art, you can have the fastest reaction time in the world. The problem is when you go to put the cursor over that cell, the market can change and you have no control over that. Yeah, then don't click the button. Nope. And when you go to click, you think you're getting a price, but because the that's not a user problem. Yeah, it is because you can't get the wrong price if it hasn't flipped on the screen. It doesn't flip in ethos and you're viewing the right price on the screen and you click on the right price but you get the wrong price. That's not the way it works. It flips on the screen and it's just you click the button because you aren't able to stop yourself from clicking even though the number on the screen has changed and you're now clicking on something you don't want. It's your time. I'll stop arguing with you over it because it's not going to get you anywhere. So maybe your point is between the time that the finger touches the mouse to click and the click is actually initiated, that nanosecond or something, the screen can flip. That's right. You can have your cursor... Wait, wait. You're suggesting to me that there's a delay? Is it in the mouse cord or is the delay in the RF frequency if you've got a clicking and the changing such that it's not user error? It's the problem with... You have to go back to the figure two style screens. The prices are in this grid and as the market changes, the prices change unpredictably. It's a really long mouse cord. That's what it is. Really long mouse cord and the signal just slowly creeps along that mouse cord. No, it's not that, Your Honor. The trader doesn't have control of what's going on in the market. When the inside market changes, when the price changes, these prices in the grid are constantly changing. The user has no control over that. And to answer your question, Judge Rania, what happens is when you put your cursor over a particular cell and you go to get that price, that price, not because of the trader, but because of what's going on in the market, that price will flip right before you're able to click and you get the unintended price. You thought you were getting 15 and you ended up getting 20. That's been found by this court on two different occasions, once in the eSpeed case and in the CQG case. That was the problem, a problem this invention was trying to solve. Problems with accuracy, problems with speed and usability. In the prior arc, there was no visualization of the market. The invention provided that improvement. That was also found in the eSpeed case and in the CQG case. I have a different question here. The regulation 42.301B, which is defining technological inventions, says at the end that the subject matter as a whole recites a technological feature that is novel and not obvious over the prior arc. Is it your position that if we undertake an technological invention in this instance, that we also have to include in that an inquiry as to whether we have something that's novel and unobvious over the prior arc? Your Honor, Versada answered this question. Versada made perfectly clear that the test you're referring to, whether there's a technological feature that solves a technical problem, a technical solution, does not look at the merits of obviousness, which makes perfect sense because we're at jurisdictional phase. You don't look to see whether the invention is obvious. You look to see whether the purported feature solves a technical problem with a technical solution. So that is our position. Under Versada, we can just ignore that particular part of the regulation? Yes. The underlying question of whether the invention is obvious is not part of the jurisdictional test of whether an invention is a technological invention. And Judge Moore, other cases from this court have established that problems with user interfaces and their solutions are technological in nature. The data engine case, the recent data engine case that we cited in R28J, perfect example. This court found there were problems with the graphical user interface. There were problems with these spreadsheets. And the invention in that case solved problems with that interface. And this court said that the problem with those spreadsheets were a technological problem in computers and that the claim solution was a specific technological solution. That's data engine. Core wireless, another recent case that we cited, said the exact same thing. Claims directed to a specific improvement to a GUI was an improvement in the functioning of the computer. These are GUI cases. These are cases in which the graphical user interface is improving over prior ART interfaces. And this court has found that's improving the functioning of the computer. Those are questions of fact in specific cases, correct? They are questions of fact, Your Honor. I do agree with that. And IB recently, in the chart trading case, IB just two months ago, described the 304 patent as, and I'm quoting now, quote, a very specific problem if the 304 patent was addressing with a technical solution to that problem. This isn't just some lawyer. This is IB, the parties here today. IB said this about TT's claims, the 304 claims, quote, implementing a technological improvement versus saying what the end result should be. IB acknowledges this is a technological improvement. They acknowledge it's a technological problem and a technological solution to that problem. And I have the site, that's the chart trading versus IB case that was argued just a few months ago before this court. Those admissions should end the jurisdictional question in TT's favor. How did the board error here? The board errored because it missed the problem in the prior ART. The problems with how the prior ART software was structured and speed, accuracy, and usability with these prior ART screens. And the board just missed it. The board missed it. The board said, oh, it's a business problem. And that was wrong. That was the root of the error with why the board found there wasn't a technological invention. The fact that the claims have some downstream benefit, of course, all inventions do. And I think DDR is instructive on that point. That was a technological problem and solution retaining people on the website. And it was a particular challenge to the internet. It addressed a business problem, but it was nonetheless a technological problem. The board also erred by missing the technical solution altogether. It ignored that TT created a new improved graphical user interface altogether, a new computer component. Instead of looking at the improved graphical user interface, the board said, well, there's no technical solution because you can use this interface on any off-the-shelf computer. But that's wrong. That's the root of the error. Again, go back to core wireless. Go back to data engine. Those inventions also could be used on different types of computers, but that doesn't mean that they're not technological inventions, technological improvements. Although the board didn't address the technological feature prong in its opinion, the technological feature in this case is the solution. The technological feature is the combination of elements of this claim, the specific combination that solves problems with speed, accuracy, and usability in the prior art screens. In sum, on the jurisdictional issue, the 304 claims recite a technological invention that are excluded from CBM review. Because the board never had jurisdiction in the first place, the board's opinion should be abrogated. If there are no other questions on the jurisdictional question, I'll reserve for rebuttal. We will save it for you, Mr. Cannon. Mr. Pickard has three minutes rebuttal. Thank you. I want to return to our earlier exchange with Judge Moore. So if you look at page 25 of the blue brief, we point out the two points I raised about the Supreme Court and Alice and Bilski looking beyond the patent to extrinsic evidence, if you will, to decide that those claims were directed to a fundamental economic practice. Of course, the board in this case stopped at its analysis at step one. And if we look then at the CQG decision, when the court here affirmed, it said that it did so, it said, we agree with this conclusion of the district court. That is, for all the reasons articulated by the district court, including that the graphical user interface of these two patents is not an idea that has existed. And so we addressed that following CQG to show that the idea was not just a practice, but was also one that has long existed. We've been clear in multiple opinions, including my Burkheimer opinion, that the newness of the abstract idea cannot be a basis for surviving an eligibility challenge. So I'm not sure, maybe you think the law is in a state of I agree that the fact that an idea is new does not transform it from an abstract idea into a non-abstract or statutorily eligible idea. But the fact that something is a fundamental economic practice may be reflected in part by the fact that it has been part of economic activity for a long time, such as double-ledger accounting or intermediate settlement. I would like to turn briefly to the CBM jurisdictional issue. So there's no challenge here to the board's rulemaking or that the board didn't look to the correct rule when it made the decision. The board in the 304 case decided that the problem addressed by the 304 patent, as well as its solution, was not technological. On the second point, the board citing the patent itself made a number of findings that the inventions here do not have a technological solution. They use conventional hardware and software. They have simple algorithms, and there is no reason to set that aside. The appellees here have not really contended with the standard of review, which is arbitrary capriciousness. There's no clear error in the issues. Thank you, Mr. Pickard. Mr. Gannon has a couple minutes on this cross-appealed issue if he needs it. With respect to the 101 issue, it's a question of law. The CQG case made it clear. Respectfully, is this part of your cross-appeal? Because your rebuttal has to be limited to your cross-appeal. Okay, thank you, Your Honor. I will address the 101 then in a different case. With respect to the CBM, with respect to the CBM issue, counsel made reference to the standard of review. Under the standard of review, under any standard of review, this ruling can't stand. And the reason why is because the board missed the problem in the prior art. It missed the problem that there was a problem with the technology. There was a problem with these prior art screens as found in eSpeed and in CQG by this court. Problems with speed, accuracy, and usability. And the board just ignored those findings just like they did on other issues with respect to this court and said, nope, it's just a financial problem. And that is wrong under any standard of review. It's a technological solution. The board said, well, I don't see any solution here because I see your patent talks about using mice. I see your patent talks about taking a computer, using conventional computers. That missed the boat. That completely missed the boat. Why? Because the technological solution is the improved graphical user interface, which this board refused to acknowledge. And they pointed to other things in the spec that are irrelevant. The fact that you can use a GUI on a conventional computer. The fact that you can use mice. The fact that, you know, software can be used. The same thing can be said in data engine and core wireless when this court found those were specific improvements to graphical user interfaces and specific improvements to computer functioning. If that's not a technological invention, I don't know what is. If I was to look for the central figure that's a technological invention in the patent, would I look towards the static price index? So under the test, you look at the claim as a whole. That's clear from Versada. You look at the claim as a whole to see whether there's a technological feature that solves a technological problem. So you would look then to the spec to see what the spec... That's what I mean. So you said technological feature. That's what I said too. Is the technological feature here the static price index? It's the combination of static plus single action plus relative movement of the indicators. It's the combination of elements that provide the visualization, which this court found in eSPEED and in CQG, and improvements in speed. It's the combination. Thank you, Mr. Gannon. We'll take the case on revisement.